IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC
SAFETY BROADBAND TECHNOLOGY ASSOCIATION,

*Petitioners,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

*Respondents.*

_____

*On Petitions for Review of Orders
of the Federal Communications Commission*

**REPLY OF PETITIONERS NATIONAL SHERIFFS' ASSOCIATION AND
CALIFORNIA STATE SHERIFFS' ASSOCIATION TO TWO
OPPOSITIONS TO ITS MOTION FOR STAY PENDING JUDICIAL
REVIEW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

I.   THE PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS ...........2

   A.  The *Order* is Arbitrary And Capricious Due to Lack of Adequate Public Notice..................................................................................2

   B.  The *Order* Strips Incumbent Licensees of Important Rights. ........................7

   C.  The *Order* Failed to Consider Less Harmful Alternatives. ...........................12

   D.  The *Order* is Self-Contradictory and Contrary to the Record ......................15

   E.  The Possibility of Seeking a Waiver Does Not Salvage the *Order*...............15

   F.  The *Order* Gives AT&T an Unfair Competitive Advantage and Undercuts Congressional National Security Efforts. .......................................................17

   G.  Petitioners Were Not Required to Challenge or Comply with the Data Collection Requirements Until They Were Approved and Implemented......18

II.   PETITIONERS HAVE SHOWN IRREPARABLE HARM ........................20

III.  THE PUBLIC INTEREST WEIGHS IN FAVOR OF A STAY ...................21

CONCLUSION ....................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM A – EXAMPLES OF PROCESSING TIMES FOR PUBLIC SAFETY AND APPLICATION FREEZE WAIVER REQUESTS

# TABLE OF AUTHORITIES

**CASES**                                                                   **Page**

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 622 (5th Cir. 2000) ...................... 16

*ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988) .................................. 16

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 38-39 (D.D.C. 2020) ............................................................................................................ 8

*Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942) .............................. 21

*WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969) .................................. 16

**STATUTES AND REGULATIONS**

47 CFR 90.1207(e)(1)(vi) .............................................................................. 8, 20

89 Fed Reg 97559 (Dec. 9, 2024) .................................................................... 19

**ADMINISTRATIVE DECISIONS**

*Eighth Report and Order, In the Matter of Amendment of Part 90 of the Commission's Rules,* WP Docket No. 07-100, FCC 24-114 (released October 22, 2024) 89 Fed. Reg. 91578 (November 20, 2024) ................................................ 1, 7

*Seventh Report and Order and Ninth Further Notice of Proposed Rule Making,* WP Docket No. 07-100, 38 FCC Rcd 704 (2023) ................................ 3, 4, 5, 18, 19

*Amendment of Parts 1 and 22 of the Commission's Rules with Regard to the Cellular Service*, Notice of Proposed Rulemaking, WT Docket No. 12-40, FCC 12-20, released February 15, 2012 .................................................................... 7

*Public Notice, "The Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data"*, DA 24-1137, released December 9, 2024 ............................................................................................ 9, 19

*Public Notice, "The Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Further Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940–4990 MHz Band"*, DA 24-1136, released November 15, 2024 .......................................20

## OTHER AUTHORITIES

US DOJ Bureau of Justice Statistics. (October 2022), *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*. (NCJ No. 302187). https://bjs.ojp.gov/library/publications/census-state-and-local-law-enforcement-agencies-2018-statistical-tables ..................................................................................6

FEMA, U.S. Fire Administration. (March 2025). National Fire Department Registry Quick Facts (https://apps.usfa.fema.gov/registry/summary) .....................6

American Public Transportation Association. 2023 Public Transportation Fact Book. https://www.apta.com/research-technical-resources/transit-statistics/public-transportation-fact-book/..............................................................................................6

O'Rielly, M. (2020, June 18) "Removing Unnecessary Barriers and Maximizing Competition in USF Auctions" FCC Blog, https://www.fcc.gov/news-events/blog/2020/06/18/removing-unnecessary-barriers-and-maximizing-competition-usf-auctions.......................................................................................17

U.S. Senate Committee on Commerce, Science, & Transportation, 113th Cong. (2014, 14 May), Bipartisan Senate Leaders: FCC Must Maximize Spectrum Auction Participation and Revenue [Press Release] https://www.commerce.senate.gov/2014/5/bipartisan-senate-leaders-fcc-must-maximize-spectrum-auction-participation-and-revenue..........................................18

# INTRODUCTION

Pursuant to D.C. Circuit Rule 27, the National Sheriffs' Association ("NSA") and the California State Sheriffs' Association ("CSSA") (collectively "Petitioners" or "NSA/CSSA") respectfully file a combined Reply to the two Oppositions-- filed on February 28, 2025 separately by Respondent Federal Communications Commission ("FCC") and Petitioners Public Safety Spectrum Alliance and Public Safety Broadband Technology Association ("PSSA") (herein collectively the "Opponents") -- to NSA/CSSA's motion for stay pending judicial review ("Motion") in the above-captioned cases.[1] The Opponents failed to show that the public – including tens of thousands of public safety agencies – had adequate notice of the FCC's abrupt decision to effectively take state and local public safety spectrum away from its intended users, based on a last minute ex parte proposal submitted after the final rulemaking proposal and pleading cycle in the proceeding. First responders have been stripped of needed licensing rights in the 4.9 GHz band by the FCC's *Order*;[2] and the Opponents have not refuted that it

---

[1]    On March 5, 2025, this Court granted Petitioners leave to file a Reply that exceeded the limitation mandated under Fed. R. App. P. 27(d)(2); D.C. Cir. R. 27(a)(2).

[2]    *Eighth Report and Order,* In the Matter of Amendment of Part 90 of the Commission's Rules, WP Docket No. 07-100, FCC 24-114 (*released* October 22, 2024) ("*Order*") (Addendum C to the Motion). *See* 89 Fed. Reg. 91578 (November 20, 2024).

1

may be years before FirstNet, the beneficiary of the FCC's eleventh hour switch, will have the funding and plan to put this spectrum to use nationwide. The Opponents also did not refute that the FCC failed to consider less harmful alternatives; and that the FCC's decision to give AT&T a spectrum windfall improperly creates an unfair competitive advantage, and undercuts Congressional national security efforts.

## ARGUMENT

I. **THE PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS**

A. **The *Order* is Arbitrary And Capricious Due to Lack of Adequate Public Notice.**

The Oppositions did not refute the showing that the FCC's last minute, drastic rule changes were never the subject of any of the numerous Notices of Proposed Rulemaking (NPRM) in the underlying proceeding. The notion of handing control of the entire 4.9 GHz public safety spectrum to FirstNet was instead raised in an ex parte filing after the close of the last comment cycle.[3]

---

[3] The FCC argues (n. 8) that "The Commission did not give FirstNet 'exclusive' control of the band." However, the Order grants to the Band Manager a nationwide "overlay license" that subsumes all unassigned 4.9 GHz spectrum, for the purpose of making this spectrum available through a lease; and the only entity it is authorized to lease the spectrum to is FirstNet. That is *de facto* exclusivity.

The FCC (p. 28-9) argues that the *Order* foreshadowed giving FirstNet exclusive control of the band and prohibiting further public safety licensing:

> Especially given the question whether to engage with "any" broadband network providers—which could, on its face, mean "any one" provider—a reasonable party "should have anticipated" that the Commission might ultimately authorize the Band Manager to engage with a specific entity, such as FirstNet.

This strained argument fails to address Petitioners' showing that the proposal to lease spectrum to carriers serving public safety entities was at all times prior to the *Order* tied to indications that state and local public safety entities would continue to be able to obtain 4.9 GHz licenses. As described in the Motion (at pp. 7-9), the FCC's *Seventh Report and Order and Ninth Further Notice of Proposed Rule Making*, 38 FCC Rcd 704 (2023) ("*Ninth FNPRM*") merely brought up the idea for potential use of the 4.9 GHz band by FirstNet and other broadband networks via, e.g., spectrum lease. *See Ninth FNPRM*, at 736, paras. 87-88. Mandatory sole use by FirstNet, and a total freeze on state and local public safety direct licensing, was not discussed.

The *Ninth FNPRM's* proposals for leasing to non-public safety entities discussed at paras. 94-104 only reinforced the notion that public safety licensees would continue to hold full geographic area license rights. The *Ninth FNPRM* asked "how" it should "address future licensing on the band" and expressly considered whether it should "lift the freeze" on new licenses in the band or

alternatively "require that new public safety deployments be under the auspices of an existing license."[4]  Thus, the public safety community was only made aware of the possibility of either having unrestricted application rights with a total lifting of the freeze, or at least the ability of existing licensees to be able to apply for new, modified or expanded licenses.  Further, the FCC indicated: "We also believe this approach will spur innovation and drive down costs while ensuring *full protection* for authorized public safety operations."[5]

The *Ninth FNPRM* also proposed that incumbents would be involved in the process of making spectrum available to the commercial carriers, proposing models under which public safety licensees could lease their spectrum to the Band Manager, veto any lease of their spectrum, or directly lease to other entities.  This arrangement would also grant public safety entities significant discretion over how and where their license spectrum is used.

The FCC (p. 11) supports the Petitioners' showing by conceding that under the *Ninth FNPRM's* proposal, "[t]he Band Manager would be responsible for 'frequency coordination . . . for public safety applicants seeking to license new or modify existing facilities in the band.' " This shows that the scheme adopted in the

---

[4]      *Ninth FNPRM* at 748-49 paras. 148-150.

[5]      *Id.* at 712 para. 20 (*emphasis added*).

4

*Ninth FNPRM* contemplated continued public safety licensing – both for incumbents and new public safety licensees. This undercuts the Opposition claims that the public should have intuited as a "natural outgrowth" that the 4.9 GHz band would be handed to FirstNet while restricting future public safety licensing.

PSSA (p. 16-18) argues that several actions contemplated in the *Order* were instituted in the *Ninth FNPRM*, because the Commission said it would "require incumbent licensees . . . to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis," and "sought comment on whether to "allow[] all incumbent licensees to retain their geographic-area licenses after they have been issued site-based licenses" (Opposition at 17). However, this also misses the point. Nothing in the Commission's efforts to transition the 4.9 GHz band to site-based licensing gave Petitioners any indication that new or modified licensing by public safety incumbents would henceforth be shut down. To the contrary, explaining what detailed technical information "future applicants" would need to supply to obtain licenses for microwave paths or base stations gave Petitioners greater certainty that the expansion and/or modification of their incumbent 4.9 GHz networks, albeit on a site-by-site basis, could continue.[6]

---

[6]     *Id.* at 718 para. 34.

Both Oppositions argue that the FCC's failure to give advance notice of the drastic rule changes it ultimately adopted is somehow cured by the fact that a few commenters were able to submit *ex parte* letters at the last minute responding to PSSA's eleventh-hour proposal to hand the 4.9 GHz band to FirstNet. See FCC at 29, PSSA at 17-18. However, the PSSA plan was not an FCC proposal; and the tens of thousands of police, fire, rescue, and other public safety eligible entities did not have fair notice that the docket had turned from an open, spectrum sharing lease arrangement to an absolute freeze and restriction on further public safety licensing. The FBI estimates there are approximately 18,000 law enforcement agencies in the United States; and FEMA indicates there are 27,056 fire departments listed with the National Fire Department Registry.[7] The vast majority of the 3,144 counties in the U.S. operate an Emergency Operations Center. In 2021, more than 6,800 organizations provided public transportation in a variety of modes.[8] These more than 55,000 public safety entities, as well as others, were

---

[7]    US DOJ Bureau of Justice Statistics. (October 2022), *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*. (NCJ No. 302187). https://bjs.ojp.gov/library/publications/census-state-and-local-law-enforcement-agencies-2018-statistical-tables; FEMA, U.S. Fire Administration. National Fire Department Registry Quick Facts (https://apps.usfa.fema.gov/registry/summary) (March 2025).

[8]    American Public Transportation Association. 2023 Public Transportation Fact Book. https://www.apta.com/research-technical-resources/transit-statistics/public-transportation-fact-book/ at p. 6.

prejudiced by the lack of notice about the FCC's abrupt turn, with potentially severe consequences.

### B. The *Order* Strips Incumbent Licensees of Important Rights.

The Oppositions fail to refute Petitioners' showing that public safety entities will suffer significant harms from the FCC's new licensing scheme. These entities lose important rights due to the *Order*'s simultaneous imposition of an absolute licensing freeze while handing FirstNet sole use of an "overlay license", thereby stripping public safety agencies of the ability to expand and modify current licenses, and obtain needed new licenses.[9]

The FCC (p. 23) argues Petitioners "have not shown that all of their operations will necessarily lose the ability to operate throughout an authorized

---

[9] In certain wireless services where incumbents were originally licensed on a site-by-site basis, the Commission auctioned off geographic-based "overlay" licenses. *See Amendment of Parts 1 and 22 of the Commission's Rules with Regard to the Cellular Service*, *Notice of Proposed Rulemaking*, WT Docket No. 12-40, FCC 12-20, released February 15, 2012 at 6, para. 8. Incumbent licensees are generally prevented from expanding or modifying their operations. The overlay licensee is given the flexibility to extend service into currently unserved areas. In the event that all or a portion of an incumbent's service is relinquished by that incumbent (e.g., through license cancellation, reduction in coverage, permanent discontinuance of operations, or failure to renew a license), the overlay licensee would no longer be required to protect the relinquished area and could immediately provide service in that area. Id. at 15, para. 30. Thus, overlay licenses are designed to lock down incumbent licensees. Nothing in the *Order* indicates that the 4.9 GHz overlay license will be any different.

geographic area." However, there is no requirement for Petitioners to show that "all of their operations" will be compromised. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 38-39 (D.D.C. 2020) (rejecting agency's arguments that plaintiffs must substantiate claims of loss and establish their significance relative to plaintiffs' operations because "[n]o such proof requirement has ever been adopted in this Circuit"). The inability of any public safety communications system to effectively operate, modify and expand is a significant injury that jeopardizes the safety of first responders and the citizens that they seek to protect.

The FCC also argues (p. 22) that public safety entities are not harmed by the *Order* because certain licenses will continue to allow geographic operations in certain aspects under 47 CFR 90.1207(e)(1)(vi). While helpful, this provision allows continued operation throughout the licensed jurisdiction for only two types of radios (mobile and temporary fixed). These operations are limited. Mobile radios often must rely on the presence of a nearby base station with a much higher power to effectively communicate.

Temporary fixed radios cannot stay in one place for more than one year. They are useful for *e.g.*, temporary events or incident management. However, they must be dismantled after temporary use, so do not offer the "forever" coverage public safety needs when *e.g.*, a new stretch of highway,

neighborhood or industrial complex is built. While some public safety entities hold temporary fixed licenses, the many public safety entities that do not hold temporary fixed licenses will presumably be unable to apply for them now, under the absolute licensing freeze imposed by the *Order*.

New permanent base stations are blocked by the freeze. The FCC's December 9, 2024 PN implementing the granular license info collection process says at p. 2: "As a reminder, operations in the band are subject to an ongoing licensing freeze." [Footnote omitted] If a Sheriff has a 4.9 GHz license for all of Fairfax County, VA, and currently has a base station at Springfield, it may not have effective communications with deputies operating with the western portion of the County unless it can establish another base station to the west. Also, public safety entities that use 4.9 GHz for fixed links connecting e.g., police or fire stations to headquarters do not benefit from any flexibility for mobiles and temporary fixed radios.

The FCC's Opposition (p. 16-17) states: "[t]he Commission explained that the new licenses that incumbents will generate when submitting their data will not "modify or alter incumbents' rights to operate their existing networks" *in any way*." (*Emphasis added*) However, this statement is incorrect, as public safety entities no longer have the right to flexibly establish needed base stations within their licensed jurisdiction. This is akin to saying that a cellular carrier can sell

phones but can no longer put up cell towers to make sure the phones will work everywhere. This bolsters Petitioners' argument that the *Order* is self-contradictory and arbitrary.

The FCC argues (p. 24) the Petitioners "claim is even weaker when examined in context" because the 4.9 GHz band "is shared amongst eligible licensees" and thus "incumbent licensees have always had to coordinate with each other to expand their operations in areas where licenses overlap." The FCC then asserts that "Movants offer no compelling reason why incumbent licensees cannot now similarly coordinate with the Commission (including by seeking a waiver of the freeze, while it remains in place, see BART Mot. 12) to expand their existing operations if necessary." *Id.* This argument is flawed: Prior to the release of the Order, coordination among public safety licensees was easily accomplished. There are a finite number of public safety agencies in any county, and with 50 MHz of spectrum to share among them interference could be avoided. Thus, the shared nature of the 4.9 GHz spectrum posed no real hindrance to public safety's ability to modify and expand their operations as needed.

Petitioners would support having public safety entities "now similarly coordinate with the Commission", but due to the freeze, a waiver would always be needed. As discussed below, going through the waiver process for every new or relocated base station or other modification is not practicable. Beyond the freeze,

it would seem that the "overlay license" rights of the Band Manager/FirstNet would continue to block public safety licensing, unless and until the FCC decides in a future phase of its 4.9 GHz rulemaking that public safety agencies can apply for their own licenses. But such FCC action is almost certainly months or years away, and well after the Court's ruling on Petitioners' appeal. Therefore, grant of the instant stay motion is still necessary.

PSSA argues that the Petitioners "have not established a cognizable reliance interest in maintaining their original geographic licenses." PSSA at 10. Again, this misses the point. Public safety licensees understood that the Commission wanted to establish a coordinated nationwide approach to managing the 4.9 GHz band, but they also knew it placed a high value on retaining the band's local control. *Ninth FNPRM* at para. 1. While the possibility of a new site-based licensing framework was being considered, incumbents reasonably believed that they would continue to have the ability to expand and/or modify their networks consistent with their existing license rights, under whatever framework the FCC ultimately adopted. These existing rights are protected through the FCC's license renewal expectancy policies, as well as by restrictions on license revocation (under Section 312 of the Communications Act) and license modification (under Section 316 of the Communications Act) which provide for notice and an opportunity to be heard. The FCC could have addressed these protections through a rulemaking, however it

failed to provide adequate notice to public safety entities in any NPRM that they could lose the ability to expand and modify their networks.

### C. The *Order* Failed to Consider Less Harmful Alternatives.

Importantly, the Oppositions utterly fail to refute the fact that FirstNet has no funding, buildout obligation or timetable for any foray into the 4.9 GHz band, and may not extend coverage to many public safety entities for years (if ever). See Motion at 10. Nor is it clear that FirstNet will offer the specific services needed by a particular public safety entity in a given area, and do so at an affordable price.

In the face of this glaring flaw, the Opponents fail to refute Petitioners' showing that the *Order* is arbitrary and capricious because it failed to consider less harmful alternatives. *See Jacob Siegel Co. v. FTC*, 327 US 608 (1946). For instance, the FCC could have allowed public safety entities to continue seeking new and modified licenses during the transition to a Band Manager and beyond. Motion at 13-14. The Oppositions actually support this approach: Both highlight the claim that the 4.9 GHz band is underutilized, with PSSA asserting (p. 3) that "recent analysis in the administrative record found that between 92% and 95% of the spectrum was unused. See Roberson & Assocs. LLC, Utilization Analysis of 4.9 GHz Spectrum 3-4 (Jan. 2024)." If usage of the 4.9 GHz band is truly this sparse, allowing continued licensing by public safety entities should have little impact on nationwide development of the band by FirstNet.

12

Specifically, 50 MHz of 4.9 GHz spectrum is available throughout the country. When the FCC auctioned off similar "midband" spectrum, it was sold off in 10 MHz or 20 MHz blocks.[10] And when FirstNet was awarded 700 MHz spectrum with which to serve the entire public safety community, it was given a 10 MHz-wide block. Therefore, taking PSSA's claim as true, there should be plenty of 4.9 GHz spectrum for FirstNet to use in its eventual development of 5G services while still allowing public safety entities to obtain new and/or modified licenses of their own.[11]

The FCC argues (at 35): "If, pending judicial review of the Eighth Order, incumbent licensees may modify and expand their footprints in the band through informal coordination with one another, without involving the Commission, progress toward optimizing access to a scarce and valuable public resource will be stalled." This argument is internally incoherent because, if the Commission's "underutilization" claim is accepted, there should be more than enough 4.9 GHz

---

[10]     For example: Auction 107 (3.7 GHz) sold 20 megahertz blocks; Auction 110 (3.45 GHz) sold 10 megahertz blocks; and Auction 105 (3.5 GHz) sold 10 megahertz blocks. Federal Communications Commission, Auction 107 Fact Sheet (3.7 GHz Service), https://www.fcc.gov/auction/107; Auction 110 Fact Sheet (3.45 GHz Service), https://www.fcc.gov/auction/110; Auction 105 Fact Sheet (3.5 GHz Band), https://www.fcc.gov/auction/105.

[11]     Even if the band is far more crowded than claimed by PSSA, 50 MHz should be more than enough spectrum in many parts of the county, as it is the equivalent of two cellular systems' spectrum.

spectrum for advancing FirstNet's proposed development of the band; and public safety can coordinate their applications through the Band Manager, in the same manner of formal frequency coordination that is used to grant most public safety radio licenses. Indeed, the 4.9 GHz Band Manager may ultimately be one of the existing FCC-designated public safety frequency coordinators.

The FCC further argues (at 26): "The upshot of the Movants' position is to require the Commission to shoot at a moving target of fluctuating spectrum use." This argument fails because 4.9 GHz spectrum use will always be a moving target, even under the freeze, as licensees discontinue operations or lose tower sites. The Commission can set up a mechanism for sharing dynamic information about changing public safety use, just as the widely used Part 90 frequency coordination process handles spectrum use decisions in the face of multiple pending applications.

Finally, the FCC argues (at 23): "the Movants' disagreement with the Commission's decision to stabilize the spectrum landscape is, at bottom, a policy disagreement." However, the problem with the freeze and shutdown of public safety licensing *on public safety spectrum* is that it has been foisted on those charged with protecting society without adequate notice, using conclusions at odds with the record, and without consideration of less harmful alternatives – all of which are fatally arbitrary and capricious under the law.

### D. The *Order* is Self-Contradictory and Contrary to the Record

PSSA argues (at 14) that the *Order* is not contradictory and incumbents will not be harmed because they retain the rights to operate their existing networks and "nothing in the Order prohibits incumbent licensees from expanding their operations in the future as long as they satisfy certain requirements."  However, PSSA fails to account for incongruous statements made in the *Order* and cited by the Petitioners (at pp. 14-15) that incumbents' priority treatment in the 4.9 GHz band would not be taken away, that the Band Manager or FirstNet would not have the authority to modify or alter the existing license rights of incumbents, and that the ruling to cancel the former licenses does not modify or alter incumbents' rights to operate their existing networks.  The flexibility that incumbent public safety licensees had to expand their coverage or to modify their facilities, as and when needed, has been rescinded under the *Order*.

### E. The Possibility of Seeking a Waiver Does Not Salvage the *Order*.

Both Opponents argue that any problem with the *Order* is cured because "licensees facing special circumstances" may "seek a waiver of the freeze." FCC at 21. The irreparable harms that the *Order* will create are not eliminated by the option to file a waiver request.  A waiver request does not create any *right* for a licensee to modify or expand its licenses, or seek a new license, as necessary to modernize and maintain the effectiveness of its public safety communications

network.  Instead, a waiver request is granted or denied at the discretion of the

FCC's staff, and is to be granted only under extraordinary circumstances.  "An

applicant for waiver faces a high hurdle even at the starting gate." *WAIT Radio v.*

*FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969).

More importantly, "[t]he FCC cannot save an irrational rule by tacking on a

waiver procedure." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988); *see*

*also Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 622 (5th Cir. 2000) ("a waiver

provision … cannot save a rule that on its own has no rational basis").  Moreover,

the processing of a waiver request often takes several months or even years.

Addendum A hereto lists several recent waiver requests filed by public safety

entities, and shows that the processing time for those requests ranged from six

months to seventeen months.  Addendum A also lists a request for waiver of the

FCC's 900 MHz spectrum freeze (i.e., the same sort of waiver request that

Opponents urge as a solution for 4.9 GHz licensees).  This waiver request took

more than four years to be processed. Public safety entities cannot reasonably

assure the timely modification or expansion of their radio networks as necessary to

address significant threats, where the waiver process takes months or years, and

still possibly result in a denial.

**F.      The *Order* Gives AT&T an Unfair Competitive Advantage and Undercuts Congressional National Security Efforts.**

The Motion (at 16-18) pointed out that the *Order* gave AT&T a windfall by handing it free access to billions of dollars of midband spectrum, creating an anticompetitive impact on other carriers, and depriving taxpayers of the required compensation; and this windfall also undercut Congress' mandate to use the upcoming AWS-3 auction to raise money for removing potentially harmful foreign equipment from U.S. telecom networks.  The only retort is the FCC's argument (at 30) that "the Associations identify nothing to suggest that the Commission was interested in helping AT&T." Petitioners do not have to show intent to help AT&T. It is the impact of the Commission's actions that can cause anticompetitive effects; and in this case such effects are obvious and were brought to the Commission's attention during the proceeding. With regard to its auction policies, the FCC has stated that "we should always aim to maximize participation and, in turn, competition, rather than arbitrarily limit the number of auction competitors."[12] The U.S. Senate has urged the FCC to maximize the revenue that will be realized

---

[12]     O'Rielly, M. (2020, June 18) "Removing Unnecessary Barriers and Maximizing Competition in USF Auctions" FCC Blog, https://www.fcc.gov/news-events/blog/2020/06/18/removing-unnecessary-barriers-and-maximizing-competition-usf-auctions.

in the auction process by, among other things, adopting transparent and fair rules and not discouraging any carrier from participating.[13]

### G. Petitioners Were Not Required to Challenge or Comply with the Data Collection Requirements Until They Were Approved and Implemented.

While the greatest harms from the *Order* are its harsher freeze and creation of an overlay license that will hinder future public safety applications for 4.9 GHz, Petitioners also pointed out that the FCC's decision to give incumbent licensees only six months to submit "granular data" applications imposed an unreasonable financial and time burden. The *Ninth FNPRM* found that the time needed for this task should be at least one year.[14] The FCC argues (at 31) that "the Movants' failure to challenge the Seventh Order—in which the FCC announced, more than two years ago, that it would undertake the data collection they now complain will cause them "irreparable . . . financial cost," . . . undercuts their claims of urgency and irreparable harm." However, the Commission's own instructions for the data

---

13      U.S. Senate Committee on Commerce, Science, & Transportation, 113th Cong. (2014, 14 May), Bipartisan Senate Leaders: FCC Must Maximize Spectrum Auction Participation and Revenue [Press Release] https://www.commerce.senate.gov/2014/5/bipartisan-senate-leaders-fcc-must-maximize-spectrum-auction-participation-and-revenue.

14      *Ninth FNPRM* at 718 para. 33.

collection show this claim to lack merit.  As noted in the FCC's December 9, 2024

*Public Notice* concerning the data collection (at 1):

> The Commission published an announcement of [OMB] approval in the Federal Register and the rules related to this collection became effective on December 9, 2024. *Consequently, compliance with the information collection requirements in section 90.1207(e)–(f) of the Commission's rules is now required.* [Emphasis added]

Thus, the FCC is arguing that the Petitioners were required to comply with

the data collection rule *before* the date established by the FCC for the start of

compliance with the data collection rule.  At Para. 34 of the *Ninth FNPRM*, the

Commission directed the Bureaus "to make any necessary enhancements to ULS,

to obtain any necessary review under the Paperwork Reduction Act, and announce

by public notice when ULS is prepared to accept the more granular data on public

safety operations in the 4.9 GHz band."

Publication of the required OMB approval of the data collection requirement

didn't happen until December 9, 2024 at 89 Fed Reg 97559.  That same day, the

FCC issued its *Public Notice* establishing the June 9, 2025 (*i.e.*, six month)

deadline for public safety licensees to submit their granular licensing data.  It is not

reasonable to argue that a licensee must be deprived of their right to seek a stay

when they have complied with the FCC's instructions and deadlines.  What if

OMB had rejected or required modification of the data collection requirements? If

Petitioners' members had started the data collection two years ago, the collected

information would have likely already changed before they had the ability to enter the data in the FCC's ULS system: During the time between the *Ninth FNPRM* and last October's *Order*, the relaxed freeze was in effect. Therefore, licensees were able to modify, relocate and expand their systems. And sometimes licensees shut down stations. It costs a substantial amount of resources and staff time to do the data collection and application preparation called for by 47 CFR Section 90.1207(e). To go through that time and expense (and engagement of an engineer, etc.) in 2023, only to have to redo it in 2025 to account for a station relocation due to a tower collapse, new base stations installed, and other changes, would be an undue burden on public safety entities.

## II.  PETITIONERS HAVE SHOWN IRREPARABLE HARM

The FCC argues (at 32): "The Sheriffs' Associations (at 20) raise abstract claims that 'public safety entities' will be harmed by their 'inability . . . to modify and/or expand existing 4.9 GHz systems.' But the Associations make no attempt to identify—let alone to substantiate—any specific needs or plans of Association members that will be impeded under the *Eighth Order*."

A stay of the FCC's November 15, 2024, *Public Notice* modifying its "relaxed freeze" on 4.9 GHz licensing is appropriate because it would allow 4.9 GHz public safety licensees to retain the flexibility they always had to modify their networks as needed, especially in response to emergencies or other unforeseen

events.  It will likely be several months before this Court has an opportunity to address the merits of Petitioners' appeal, and during that time all public safety licensees are in limbo such that if an urgent situation comes up they are not able to undertake a modification, expansion or new application as a matter of right. They can seek a waiver but will likely have to wait months for a resolution (see Addendum A), and after that long delay may be denied the waiver.  An appellate court's power to hold an order in abeyance while it assesses the order's legality has been described as inherent, and part of a court's "traditional equipment for the administration of justice." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942).

The FCC's argument that the Petitioners cannot point to a situation NOW that would require a modification, expansion or new license misses the mark. California's first responders didn't have advance notice that a spate of deadly/destructive wildfires would begin on January 7, or where the various fires would break out.  Emergencies happen at unexpected times and public safety licensees need to have the ability to modify or expand their 4.9 GHz networks and services in response to unforeseen events.

## III.   THE PUBLIC INTEREST WEIGHS IN FAVOR OF A STAY

As indicated in the Motion at 23, a stay would not have a substantial negative impact on any interested party. Rather, it would maintain the *status quo*

pending substantive resolution of the appeals pending before this Court. Incumbent licenses would be able to respond when modifications to their existing public safety networks are needed, better protecting the public and first responders. FirstNet will not be substantially harmed by this brief delay, as there is no indication in the record that FirstNet has funding or plans to imminently implement 4.9 GHz; and in any event, there is 50 MHz of 4.9 GHz spectrum that can be shared between incumbents and FirstNet. Given Petitioners' showing above and in the Motion that they are likely to prevail on the merits, and the Opponents' failure to adequately counter this showing, the public interest calls for a grant of this Motion.

## CONCLUSION

For the foregoing reasons, NSA and CSSA respectfully request that the Court grant their Motion for Stay to preserve the status quo pending review of the merits of their appeal.

Respectfully submitted,

*/s/ James M. Smith*_____
James M. Smith

Law Office of James M. Smith
4069 27th Road North
Arlington VA 22207
jamesmsmith8980@gmail.com
Telephone: (703) 855-4183

*Counsel for Petitioners National Sheriffs'
Association and California State Sheriffs'
Association*

Dated: March 7, 2025

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements
and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)[15] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):
   ☒ this document contains 5109 words, or
   ☐ this document uses a monospaced typeface and contains lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Times New Roman</u>, or

   ☐ this document has been prepared in a monospaced spaced typeface using _____ with _____.

*/s/ James M. Smith*_____
James M. Smith
*Counsel for Petitioners National Sheriffs'*
*Association and California State Sheriffs'*
*Association*

---

[15]    On March 5, 2025, this Court granted Petitioners leave to file a Reply of up to 5,200 words, exceeding the limitation otherwise mandated under Fed. R. App. P. 27(d)(2); D.C. Cir. R. 27(a)(2).

# CERTIFICATE OF SERVICE

*National Sheriffs' Association and the California State Sheriffs' Association v.*
*Federal Communications Commission et al.*

Case No. 25-1028 (and consolidated cases)

I hereby certify that, on March 7, 2025, the foregoing Reply was served upon

all counsel of record by filing a copy of the document with the Clerk through the

Court's electronic docketing system.

Dated: March 7, 2025

                                  Respectfully Submitted,

                                  /s/ *James M. Smith*

                                  James M. Smith
                                  *Counsel for NSA and CSSA*

**ADDENDUM A**


**EXAMPLES OF PROCESSING TIMES FOR PUBLIC SAFETY AND APPLICATION FREEZE WAIVER REQUESTS**

## **Public Safety Waiver Request Timelines**

| Entity | Freq. Band | Date Filed | Action Date | Delay | Citation |
|---|---|---|---|---|---|
| Virginia State Police | Part 22 UHF | 6/25/2020 | 3/31/2022 (G) | 9 mo | 37 FCC Rcd 4462 |
| Virginia State Police | Part 22 UHF | 2/16/2023 | 12/19/2023 (G) | 10 mo | 38 FCC Rcd 12011 |
| Lincoln County, ME | Part 90 TIS | 10/31/2023 | 4/10/2024 (D) | 5+ mo | 39 FCC Rcd 3201 |
| City of Woodburn, OR | Part 90 VHF | 3/19/2024 | PENDING | 11+ mo | ULS 0010983172 |
| Government of US Virgin Is | Part 90 VHF | 3/10/2022 | 8/21/2023 (G) | 17+ mo | ULS 0009948269 |
| City of New Bedford, MA | Part 90 T-Band | 9/14/2023 | 6/7/2024 (G) | 8+ mo | ULS 0010694508 |
| City of New Bedford, MA | Part 90 T-Band | 4/1/2022 | 5/11/2023 (G) | 13+ mo | ULS 0009981234 |
| City of New Bedford, MA | Part 90 T-Band | 9/9/2022 | 5/11/2023 (G) | 8+ mo | ULS 0010197335 |

## **Industrial/Business Waiver Request Timeline of Freeze**

| Entity | Freq. Band | Date Filed | Action Date | Delay | Citation |
|---|---|---|---|---|---|
| Evergy Kansas Central, Inc. / Evergy Metro, Inc. / Evergy Missouri, Inc. | Part 90 900 MHz | 4/4/2020 | 6/24/2024 (G) | 50+ mo | 39 FCC Rcd 6667 |

Note:  (D) = Dismissed
(G) = Granted